## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE ESTATE OF PDAYA MARK, by and
through its personal representative and heir,
Chava Rachel Mark;
CHAVA RACHEL MARK, individually, as
personal representative and heir of the Estate of
Pdaya Mark, and as parent and natural guardian of
RLM and EBM, minors;                              Civ. No. 24-civ-2133
RLM, minor, by her mother and natural guardian;
EBM, minor, by her mother and natural guardian;
YISCA (ISKA) MARK;
SHIRA MARK HARIF;
NETANEL MARK;
YEHOSHUA MARK;
MIRIAM MARK;
ORIT MARK ETTINNGER; and
TEHILA MARK,

                        Plaintiffs,

        vs.

THE ISLAMIC REPUBLIC OF IRAN,

                        Defendant.
_____/

## COMPLAINT

Plaintiffs, The Estate of Pdaya Mark, Chava Rachel Mark, RLM, EBM, Yisca Mark[1],

Shira Mark Harif, Netanel Mark, Yehoshua Mark, Miriam Mark, Orit Mark Ettinnger, and Tehila

Mark, by and through undersigned counsel, bring this action for damages against Defendant, the

Islamic Republic of Iran, and allege as follows:

## INTRODUCTION

1.      This is a civil action brought pursuant to the "Terrorism Exception" to the Foreign

Sovereign Immunities Act, 28 U.S.C. § 1605A ("FSIA"), seeking damages for wrongful death,

---

[1] In some official documents Yisca Mark's name is spelled with an alternative spelling, "Iska." But it is the same person.

personal injury, and related torts, resulting from a terrorist attack ("Terrorist Attack" or "Attack") carried out by Islamic Resistance Movement a/k/a "Harakat al-Muqawamah al-Islamiyya" ("Hamas").

2.     Hamas has been designated by the U.S. government as a Specially Designated Terrorist ("SDT") (since 1995), a Foreign Terrorist Organization ("FTO") (since 1997), and a Specially Designated Global Terrorist ("SDGT") (since 2001).

3.     Defendant, the Islamic Republic of Iran ("Iran"), provided Hamas with material support and resources, authorized and ratified the actions of its officers, employees, and agents described herein, and took other actions that facilitated, enabled, and caused the Terrorist Attack.

4.     Since 1984 through the present, Iran has been continuously designated by the U.S. Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter and over the defendant pursuant to 28 U.S.C. §§ 1330, 1331, 1367, and 1605A.

6.     Defendant is subject to suit in the courts of the United States as a sponsor of the terrorist group Hamas pursuant to the Foreign Sovereign Immunities Act, as amended, 28 U.S.C. § 1605A(a), and related statutes, including Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. § 2405(j), Section 40 of the Arms Export Control Act (22 U.S.C. § 2780), and Section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), under which Iran has been designated as a state sponsor of terrorism.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f).

## PARTIES

8.     Pdaya Mark ("Pdaya") was, at all relevant times, a United States citizen. Pdaya was murdered at age 22 on October 31, 2023 in a terrorist attack committed by Hamas with the material support of Iran. The Plaintiffs are Pdaya's estate and surviving immediate family members, all but one of whom are United States nationals.

9.     Plaintiff, Estate of Pdaya Mark brings this action through its personal representative and heir, plaintiff Chava Rachel Mark.

10.    Plaintiff, Chava Rachel Mark is, and at all times relevant hereto was, a United States citizen. She is the bereaved mother of Pdaya Mark. Under the law of the State of Israel, where both Pdaya and Chava Mark resided, Chava is a legal heir and personal representative of Pdaya's estate. Chava Mark brings this action individually, on behalf of the Estate of Pdaya Mark, and on behalf of her minor children, RLM and EBM.

11.    Plaintiff, RLM is a minor child of Chava Mark and a sibling of Pdaya Mark. RLM is a United States citizen.

12.    Plaintiff, EBM is a minor child of Chava Mark and a sibling of Pdaya Mark. EBM is a United States citizen.

13.    Plaintiff, Shira Mark Harif is, and at all times relevant hereto was, a United States citizen. She is a surviving sister of Pdaya Mark.

14.    Plaintiff Netanel Mark is, and at all times relevant hereto was, a United States citizen. He is a surviving brother of Pdaya Mark.

15.    Plaintiff, Yehoshua Mark is, and at all times relevant hereto was, a United States citizen. He is a surviving brother of Pdaya Mark.

16.    Plaintiff Miriam Mark is, and at all times relevant hereto was, a United States citizen. She is a surviving sister of Pdaya Mark

17.    Plaintiff Orit Mark Ettinnger is, and at all times relevant hereto was, a United States citizen. She is a surviving sister of Pdaya Mark.

18.    Plaintiff, Tehila Mark is, and at all times relevant hereto was, a United States citizen. She is a surviving sister of Pdaya Mark.

19.    Plaintiff, Yisca Mark is the widow of Pdaya's oldest brother, David Shlomo Mark ("Shlomi"), who predeceased Pdaya.

20.    Yisca grew up in the same small town where the Mark family lives. As a child, she was best friends with Pdaya's sister, Plaintiff, Shira Mark Harif. And when Yisca was 14 years old, she became the girlfriend of Pdaya's brother, Shlomi Mark.

21.    Yisca and Shlomi married in 2008 when Pdaya was only seven years old. After their wedding, Yisca and Shlomi continued to live in the same town as the rest of the Mark family.

22.    On July 1, 2016, when Pdaya was 15 years old, Pdaya, his parents, Chava and Michael ("Miki"), and Pdaya's sister, Tehila, were victims of a different Hamas terrorist attack. *See Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16 (D.D.C. 2022).

23.    Pdaya's father, Miki, was killed in the 2016 attack. Pdaya's mother, Chava, was seriously and permanently injured in the attack. And Pdaya and Tehila were both physically injured and severely emotionally injured in the 2016 attack. *See id*.

24.    Following Miki's sudden and violent death, and with Chava being severely disabled, Shlomi and Yisca became parent figures for the younger Mark children, and for Pdaya more than the others.

4

25.     Pdaya moved into Shlomi's and Yisca's house to live with them and their children.

26.     Tragically, Shlomi died in a traffic accident in 2019. Pdaya continued to live with Yisca and her children.

27.     Yisca had always considered Pdaya her brother. After the 2016 attack, and especially after Pdaya moved in with her family, Yisca became a second mother to Pdaya as well.

28.     The entire Mark family suffered and continue to suffer from Pdaya's violent death.

29.     Defendant is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603, designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371) and section 40 of the Arms Export Control Act, 22 U.S.C. § 2780.

30.     Iran conspired with Hamas and provided material support and resources for the commission of acts of extrajudicial killing, torture, and hostage taking, within the meaning of 28 U.S.C. § 1605A, including the Terrorist Attack, authorized and ratified the actions of its officers, employees and agents described herein, and performed other actions that facilitated, enabled, and caused the Terrorist Attack and the harm to the plaintiffs herein.

## FACTS

### A.  The Extra-Judicial Killing of Pdaya Mark

31.     On October 7, 2023, Hamas launched a massive coordinated and ongoing terrorist attack against Israel (the "Attack") and its population. In the opening minutes of the Attack,

Hamas fired more than three thousand rockets into Israel, while terrorists from Hamas's elite, Iran-trained Nukhba unit poured through multiple breaches in the border fence separating Israel from Gaza.

32.    Prior to October 7, 2023, Hamas, Iran, and others, planned, conspired, and made preparations to carry out the Attack.

33.    Once inside Israel, Hamas operatives murdered more than 1200 people from at least 40 different nationalities, including Americans. The vast majority of those murdered by Hamas were civilians, including babies, children, and elderly. Hamas slaughtered more than 360 young people who were attending an outdoor music festival[2].

34.    The Hamas terrorists took custody or physical control over many victims and carried out some of the most brutal acts of physical, sexual, and emotional torture conceivable.

35.    The Hamas terrorists deliberately took steps to sadistically maximize the pain and humiliation of as many victims as possible.

36.    The Hamas terrorists dismembered and burned victims alive.

37.    Many victims were raped and otherwise violently sexually tortured.

38.    The Hamas terrorists sliced off the breasts, genitals, and other body parts of some of the victims – also while the victims were still alive. Other victims were shot in their genitals.

39.    Thus, Hamas murdered, maimed, raped, burned, and injured their victims, often carrying out these acts in front of the victims' spouses, children, parents, other relatives, and friends, forcing them to witness the torture of their loved ones.

40.    Many of Hamas's acts of murder, torture, rape, and hostage taking were filmed by the terrorists themselves using Go-Pro and similar digital cameras that they wore or carried during the Attack.

---

[2] https://www.timesofisrael.com/death-count-from-music-festival-massacre-on-oct-7-up-to-over-360/

41.    Hamas terrorists abducted more than 240 people from 29 different countries, and brought them back to Gaza, where they continued to torture and rape many of the hostages.

42.    Hamas explicitly used, and continues to use, the hostages as bargaining chips to compel Israel to release Hamas terrorists held in Israeli prisons, to reduce its attacks against Hamas terrorists and terror bases, and to achieve other strategic goals.

43.    Hamas has also used, and continues to use the hostages to compel other countries and third parties, including the United States, to take action that would be beneficial to Hamas, and to extract other concessions that would benefit Hamas.

44.    Hamas has explicitly and implicitly conditioned the release of some or all of the hostages upon Israel, the United States, and other countries and third parties releasing Palestinian prisoners and providing Hamas with other concessions

45.    As of this date, more than 100 hostages and bodies of deceased hostages remain in the hands of their terrorist captors. Many are rumored to have been killed by their captors. But these rumors cannot be confirmed because Hamas has steadfastly refused to allow the International Committee of the Red Cross or other third parties to visit the hostages.

46.    Reports from released or rescued hostages confirm that the Hamas continues to torture, rape, and enslave remaining hostages.

47.    At least thirty United States citizens were killed in the Attack. And at least ten Americans are presumed to have been taken hostage. Many bodies of those killed were burned or mutilated beyond recognition, and therefore, have not yet been identified.

48.    In December 2023, the White House confirmed that at least eight United States citizens were still being held hostage in Gaza.

49.    During the first days of the Attack, some Hamas terrorists succeeded in seizing positions up to 15 miles into Israel, and holding their ground for several days. During this time Hamas terrorists continued their killing spree.

50.    Meanwhile, Hamas continued, from Gaza, to fire missiles and rockets into Israel, targeting civilian population centers.

51.    Israel responded to the ongoing Attack by sending the Israel Defense Forces (the "IDF")  to southern Israel, and then into Gaza to confront and repel the terrorists, to stop the missile and rocket fire into Israel, and to free hostages.

52.    Pdaya Mark was an American citizen who was raised in Israel and who was drafted into the IDF. He served in the Givati infantry brigade.

53.    In October 2023, Pdaya was deployed to repel and end the Hamas Attack and to attempt to rescue hostages in Gaza.

54.    On October 31, 2024, Pdaya and his unit were in an armored personnel carrier when Hamas terrorists fired an anti-tank missile at the vehicle killing Pdaya and nine others.

**B.  Hamas is a radical terrorist organization that publicly and proudly executes terrorist attacks including the attack in which it killed Pdaya Mark.**

55.    Hamas is a radical terrorist organization that openly declares its goals of creating an Islamic state covering the entire territory of Israel, the West Bank, and the Gaza Strip, as well as the destruction of the State of Israel and the murder or expulsion of its Jewish residents.

56.    Hamas is extremely anti-American and anti-Western.

57.    Hamas is formally committed to the destruction of the State of Israel, a sovereign state, and it rejects achieving a peaceful resolution between Israel and the Palestinians.

58.     The Hamas Charter, originally adopted in 1988, explicitly calls for the destruction of the State of Israel; declares that the land of Israel is an exclusively Islamic *Wakf* (Holy Possession); and rejects any negotiated settlement with Israel.

59.     The Hamas Charter is also explicitly antisemitic and genocidal. It proclaims:

> The Day of Judgment will not come about until Moslems fight Jews and kill them. Then, the Jews will hide behind rocks and trees, and the rocks and trees will cry out: "O Moslem, there is a Jew hiding behind me, come and kill him."

60.     Since October 7, 2023, several senior Hamas members have claimed responsibility for the Attack and hostage-taking, ratified the Attack and hostage-taking, and reiterated their commitment to the eradication of the State of Israel and its Jewish population.

61.     Hamas politburo member, Ghazi Hamad proclaimed, in an interview on Lebanese television, that Hamas will repeat its violence of October 7, 2023 many times, until Israel is completely annihilated[3].

62.     Hamas has proclaimed that it took hostages to pressure the Israeli and American governments, consistent with Hamas's other terrorist activities and its total rejection of peace with Israel.

63.     Hamas has explicitly used, and continues to use the hostages as bargaining chips to compel Israel to release Hamas terrorists held in Israeli prisons, to reduce its attacks against Hamas terrorists and terror bases, and to achieve other strategic goals.

---

[3] James Cleverly, who was then the Foreign Secretary of the United Kingdom, shared on his X (Twitter) account a video showing excerpts of the Gahzi Hamad interview. The Foreign Secretary wrote, "How can there be peace when Hamas are committed to the eradication of Israel? This is an official from Hamas committing to repeat the atrocities from 07/10 again and again." See https://x.com/JamesCleverly/status/1719718109739688143?s=20, last visited June 9, 2024.

64.     Hamas has also used, and continues to use the hostages to compel other countries and third parties, including the United States, to take action that would be beneficial to Hamas, and to extract other concessions that would benefit Hamas.

65.      Hamas is committed to achieving its objectives by violent means, including acts of international terrorism. It seeks to achieve these goals by carrying out terrorist attacks against innocents in Israel, the West Bank, and the Gaza Strip.

66.     Hamas proudly and openly acknowledges it uses terrorism to achieve its political goals. Hamas uses terrorism to coerce, intimidate and influence the Israeli government and the public at large, and thereby bring about the eventual eradication of the State of Israel, its replacement with an Arab state, and the murder and/or expulsion of the Jewish residents of the State of Israel.

67.     Hamas has carried out hundreds of terrorist attacks intentionally injuring and killing American citizens through bombings, shootings, stabbings, rocket attacks, the launching of incendiary terror devices, hostage takings, torture, and a wide variety of other terror activities. Hamas not only encourages these attacks, but is proud of the attackers, who become celebrated martyrs who have received incentives and rewards for having committed acts of murder and other acts of international terror.

68.     Continuously since 1995, and at all times relevant hereto, Hamas has been designated by the United States as a Specially Designated Terrorist ("SDT").

69.     Continuously since 1997 and at all times relevant to this litigation, Hamas has been listed by the United States Department of State as a Foreign Terrorist organization ("FTO").

70.     Continuously since 2001, and at all times relevant to this litigation, Hamas has been listed pursuant to Executive Order No. 13224 as a Specially Designated Global Terrorist ("SDGT").

71.     Iran is aware of the aforementioned designations.

72.     Since not later than 2003, United States courts have reached and published numerous decisions finding that Hamas was responsible for terrorist attacks in which U.S. citizens were killed and injured.

73.     Iran is aware of these decisions and findings.

74.     In August and September 2005, Israel unilaterally withdrew from the Gaza Strip, leaving the territory under the control of the Palestinian Authority.

75.     In 2006, the Palestinian Authority held parliamentary elections in which Hamas won a plurality of the votes. Hamas was then included in the Palestinian governing coalition, but a violent power struggle ensued between the previously-dominant Fatah faction and Hamas.

76.     By June 2007, Hamas had taken control of the entire Gaza Strip.

77.     Since the 2007 Hamas take-over, and until and including October 31, 2023 and beyond, Hamas was the *de facto* ruling power of Gaza and exercised control over Gaza's population and all governing institutions.

78.     Hamas built Gaza into an enormous terror  base. Hamas commanded a vast terrorist armed force including approximately 40,000 fighters, tens of thousands of rockets and medium-range missiles, and a massive array/supply of small arms, mortars, crew-served weapons, anti-tank missiles, anti-aircraft guns, mines, improvised explosive devices, and other weapons supplies.

11

79.     During its rule of Gaza, Hamas constructed approximately 400 miles of terror tunnels. Some of Hamas's terror tunnels were built up to 200 feet below the ground and some of Hamas's tunnels were so large that cars could be driven through them.

80.     In 2019, Hamas organized weekly "protests" along the Israel-Gaza security fence. During these riots, Hamas terrorists threw explosive devices at the fence and launched incendiary balloons and other explosives towards Israel.

81.     Also in 2019, Hamas launched more than 1,200 rockets and mortars towards Israel, killing 10 civilians, forcing Israelis to hide in shelters and to close schools and businesses.

82.     These attacks were not only intended to cause death and destruction. They were also part of a Hamas plan to test the Israeli border defenses to identify weak spots, in preparation for a future invasion.

83.     In the following years, Hamas continued it rocket fire and violent demonstrations along the border with Israel. The demonstrations included the use of explosive devices and live fire, including anti-tank missiles, aimed at Israelis.

84.     On several occasions, Hamas attempted to infiltrate the border. In an August 21, 2001 incident a Hamas gunman approached an Israeli border post and shot and killed an Israeli soldier at point-blank range.

85.     Hamas built fake "towns" in Gaza to resemble Israeli towns and trained terrorist forces to overpower Israeli defenses and occupy the towns.

86.     In this way, Hamas built up its terrorist infrastructure and prepared for an earth-shattering attack surpassing any previous Palestinian terrorist attack.

**C.  Iran Conspired with, and Provided Hamas with Vast Amounts of Material Support for Terrorism.**

87.     Hamas did not, on its own, become a terrorist force. Since its formation in 1987, Hamas has received enormous amounts of material support from Iran. This support has included, among other things, substantial financial assistance, arms, military training, and logistical support.

88.     Iran also helped Hamas establish its own weapons-manufacturing facilities.

89.     Since the 1979 Revolution, Iran has been ruled by a series of governments deeply hostile to the United States and Israel.

90.     During all periods relevant to this suit, it has been the continuous and official policy of Iran to use terrorism against the United States and its allies, including Israel, to advance its interests both domestically and abroad. By providing material support and resources to terrorist organizations, Iran is able to enlist these terrorist proxies to carry out attacks against the United States and Israel, and advance Iranian interests around the world. Iran exploits its support for terrorist organizations to obtain leverage with other countries, either "punishing" them or obtaining concessions from them.

91.     Additionally, Iran utilizes its support of international terrorism to attempt to (a) intimidate and influence the United States government and public and thereby to weaken, harm and undermine the United States militarily, economically, and politically; and (b) intimidate and influence the Israeli government and public and thereby seek to bring about the eventual eradication of the State of Israel, its replacement with an Arab state, and the murder and/or expulsion of the Jewish residents of the State of Israel.

92.     Towards these ends, Iran has provided massive material support and resources to numerous anti-American and anti-Israel terrorist organizations, including Hamas, which shares Iran's violently anti-American and anti-Israel ideology.

93.     During the period relevant hereto, Iran provided Hamas with material support and resources within the meaning of 28 U.S.C. § 1605A(a)(1), described below, with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, torture, and hostage taking, including the Terrorist Attack.

94.     Such support was provided continuously, routinely, and in furtherance and as implementation of a specific policy and practice established and maintained by Iran, in order to assist Hamas achieve goals shared by Iran. These goals included terrorizing the Jewish civilian population in Israel, weakening Israel's economy, social fabric, and military strength and preparedness, and harming Israel's allies and supporters, especially the United States.

95.     Iran provided the material support and resources through its security and intelligence agencies. These security and intelligence agencies included primarily, but without limitation, the Islamic Revolutionary Guard Corps ("IRGC"), and a subdivision of the IRGC known as the Islamic Revolutionary Guard Corps-Quds Force ("IRGC-QF").

96.     Iran provided Hamas with the material support and resources through officers, employees, and agents of Iran who worked in or with the IRGC and the IRGC-QF. These Iranian officers, employees, and agents included without limitation: Mohammad Ali Jafari, Qasem Soleimani, Esmail Qaani, and Mohammad Reza Zahedi (collectively below: "Iranian Officials").

97.     In addition, at all times relevant hereto, Iran and the Iranian Officials provided Hamas with the material support and resources by and through the agency of the Hezbollah

terrorist organization and other Iranian-supported terrorist groups and terrorist operatives (collectively below: the "Iranian Agents"), which and who received material support and resources from Iran and the Iranian Officials for the purpose of providing material support and resources to Hamas, and which acted as agents and proxies of Iran and the Iranian Officials for that purpose. The Iranian Officials and the Iranian Agents are collectively referred to below as Iran's "Officials and Agents."

98.    The material support and resources provided to Hamas by Iran and its Officials and Agents in the years immediately prior to the Attack for the purpose of facilitating acts of extrajudicial killing, torture, kidnapping, and terrorism included inter alia: provision of financial support to Hamas; provision of specialized and professional military training for the planning and execution of terrorist attacks (hereinafter: "terrorist training") to Hamas; provision of military-grade explosives, military firearms and other weapons and matériel to Hamas; provision of access to training bases and military facilities in which terrorist training was provided to Hamas and its operatives; provision to Hamas and its leaders and operatives of safe haven and refuge from capture; provision to Hamas of electronic communications equipment and access; provision to Hamas of financial services, including banking and wire transfer services; and provision to Hamas of means of transportation, including providing leaders and operatives of Hamas passage on Iranian-owned aircraft to allow them to avoid detection and carry out further terrorist attacks.

99.    Iran has worked with Hamas to smuggle into Gaza a huge array of weapons, including assault rifles, rocket-propelled grenades, anti-tank missiles, surface to air missiles, rockets and longer range missiles.

100.    Iran also helped Hamas establish its own weapons-manufacturing facilities, where Hamas now can produce its own rockets and missiles, including anti-tank missiles.

101.    Iranian financing and training were instrumental in enabling and establishing a train-the-trainer program, which enabled Hamas to send a number of its agents abroad for training by Iranian or Hizbollah agents. These Hamas agents would then return to the West Bank or Gaza and train others.

102.    Iran and its Officials and Agents gave substantial aid and assistance to Hamas, and provided the massive material support and resources described above to Hamas, and thereby aided and abetted Hamas, all with the specific intention of causing and facilitating the commission of acts of extrajudicial killing, torture, kidnapping, including the Attack in which Pdaya Mark was murdered. Iran and its Officials and Agents did so with actual knowledge that Hamas had killed, tortured, kidnapped, and injured numerous U.S. citizens in terrorist attacks and that additional U.S. citizens and other innocent civilians would be killed, tortured, kidnapped, and injured as a result of their aiding, abetting, and provision of material support and resources to Hamas.

103.    Iran and its Officials and Agents knowingly and willingly conspired, agreed, and acted in concert with Hamas, in pursuance of the common plan, design, agreement and goals discussed above, to cause and facilitate the commission of acts of extrajudicial killing, torture, and hostage taking, including the Terrorist Attack. Iran and its Officials and Agents did so with actual knowledge that Hamas had killed, tortured, kidnapped, and injured numerous U.S. citizens and that additional U.S. citizens and other innocents would be killed, tortured, taken hostage, and injured as a result of their conspiracy with Hamas.

104.    At all times relevant hereto, IRGC and the IRGC-QF were agencies, instrumentalities and/or offices of Iran, and performed actions on behalf of Iran, in furtherance of the interests and policy of Iran and within the scope of their agency and office, within the meaning of 28 U.S.C. §1605A(a)(1) and 28 U.S.C. §1605A(c), which caused the Terrorist Attack and harm to the plaintiffs herein, in that IRGC and the IRGC-QF implemented and acted as conduits and instrumentalities for Iran's provision of funds, terrorist training, and other material support and resources to Hamas for the commission of acts of extrajudicial killing, torture, and hostage taking including the attack in which Pdaya Mark was killed.

105.    Iran authorized, ratified, and approved the actions of the IRGC and the IRGC-QF described herein, and is therefore both directly and vicariously liable for those actions.

106.    At all relevant times, Iran's Officials and Agents were officers, employees, and/or agents of Iran, and performed actions on behalf of Iran, in furtherance of the interests and policy of Iran, and within the scope of their office, employment and agency, within the meaning of 28 U.S.C. §§ 1605A(a)(1) and 1605A(c), which caused the murder of Pdaya Mark and harm to the plaintiffs herein, in that Iran's Officials and Agents authorized, planned and caused the provision of funds, terrorist training and other material support and resources by Iran to Hamas for the commission of acts of extrajudicial killing, torture, and hostage taking, including the murder of Pdaya Mark.

107.    Iran authorized, ratified, and approved the actions described herein of its Officials and Agents, and is therefore directly and vicariously liable for those actions.

108.    Since at the latest 1993, Iran has been the primary supporter of Hamas, providing financing, training, weapons, logistical support, and other forms of material support for Hamas.

109.    Also in 1993, Hamas and Islamic Jihad joined the Damascus-based Alliance of Palestinian Forces. In 1995, Hamas and Islamic Jihad established an operational headquarters in Damascus, and at the request of Iran, and with the help of Iran's proxy Hezbollah, began coordinating their terrorist activities.

110.    Qasem Soleimani became the commander of the IRGC-QF in 1997. In this capacity, he had primary responsibility for building Iran's network of terrorist proxies (what Iran refers to as the "Axis of Resistance"), and as the leader of the IRGC-QF, he worked closely with Hamas leaders to ensure that Iran provided Hamas's material needs.

111.    In 2000, Iran's Supreme Leader, Ayatollah Ali Khameni said, "The Palestinian people must continue the blessed Jihad and standing against the enemies of Islam...The Hamas, Islamic Jihad and Fatah forces must continue the struggle in a united way. Indeed, the only solution is the elimination of the root of this crisis, which is the Zionist regime imposed on the region."

112.    Soleimani and other Iranian Officials and Agents organized several meetings in Tehran and Beirut where they brought together members of the Axis of Resistance, including Hamas, to coordinate strategies and terrorist attacks against Israel, the United States, and other western powers.

113.    Salah Al-Arouri was the top Hamas man in Lebanon. He coordinated Hamas's activities with the IRGC and Hezbollah.

114.    Iran has advanced efforts to coordinate, under Hamas's leadership, the activities of Hamas and other Palestinian terrorist organizations. Moreover, Iran provides extensive material support to Hamas and all major designated Palestinian terrorist organizations.

115.    Thus, a terrorist conspiracy was established and continues to this day, with Iran at the hub and having the violent annihilation of Israel as its goal. Hamas is a key player in this conspiracy.

116.    Although Iran has long been providing Hamas with tens of millions of dollars of support, in August 2017, Hamas leader in Gaza, Yahiya Sinwar confirmed that Iran was the greatest backer, both financially and militarily, of Hamas's military wing.

117.    After that, Iranian support for Hamas only increased. By 2018, along with Hezbollah, Hamas was one of Iran's two most important terror proxies.

118.    According to the 2019 County Report on Terrorism, an annual report published by the Department of State, in prior years, Iran "spent as much as $700 million per year to support terrorist groups, including Hizballah and Hamas." CRT 2019 at 2.

119.    In addition to providing massive amounts of financial support, Soleimani and others also worked with Hamas to help the terrorist organization produce its own rockets, missiles (including anti-tank missiles), and drones. Iran provided extensive funding, technology, and training to further this program.

120.    In 2020 Soleimani was killed in an airstrike carried out by American forces. Soleimani was replaced at the head of the Quds Force by Esmail Qaani, who remains the commander of the Quds Force.

121.    Under the leadership of Soleimani and Qaani, Iran increased funding for various terrorist organizations, including Hamas.

122.    By 2023, Iran was providing Hamas at least $70 million to $100 million per year.

123.    United States courts have held Iran directly responsible for numerous attacks by Hamas because of its provision of material support and resources to Hamas. As required under

the FSIA, Iran has been served with numerous judgments finding it liable for terrorist attacks by Hamas.

124.    Moreover, Iran has selectively litigated some of these cases in United States courts. *See e.g., Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1320 n.5 (2016) (listing the judgments being enforced and including certain judgments that were based upon Iranian support for Hamas terrorism); *Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018) (judgment enforcement against Iran based upon Iranian support for Hamas terrorism).

125.    Thus, Hamas's practice of carrying out terrorist attacks, and its multiple designations as a terrorist organization, were and are well known to the public at large, including to Iran. With knowledge of Hamas's terrorist goals and with the deliberate intent to further those goals, Iran conspired with and provided material support to Hamas.

126.    Any and all conditions to commencement of this suit have been satisfied, waived, or are futile.

**FIRST COUNT**
**ACTION FOR DAMAGES UNDER 28 U.S.C. § 1605A(c)**

127.    The preceding allegations are incorporated by reference as though fully set forth herein.

128.    Iran is a foreign state that, since 1984, has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

129.    Iran provided to Hamas material support and resources, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the Terrorist Attack.

130.    Iran conspired with Hamas to carry out the Terrorist Attack.

131.    IRGC and the IRGC-QF are agencies, instrumentalities and/or offices of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attack, and conspired with Hamas to carry out the Terrorist Attack, all within the scope of their agency and office.

132.    Iran's Officials and Agents are officers, employees, and/or agents of Iran, and they provided the material support and resources which caused and facilitated the Terrorist Attack, and conspired with Hamas to carry out the Terrorist Attack, all while acting within the scope of their office, employment, and agency.

133.    Hamas is, and was at the time of the Attack, an agent of Iran, and it carried out the Terrorist Attack while acting within the scope of its agency.

134.    The Terrorist Attack, including the murder of Pdaya Mark, constituted an extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

135.    The death of Pdaya Mark and the injuries suffered by all plaintiffs were caused by a willful and deliberate act of terror and extrajudicial killing committed by Hamas, a Foreign Terrorist Organization, with the material aid and support of the Defendant Iran.

136.    Iran rendered material support to the activities of Hamas that resulted in the murder of Pdaya Mark and the emotional and other injuries to each of the plaintiffs.

137.    Iran is therefore liable for the full amount of plaintiffs' damages under 28 U.S.C. § 1605A(c), in such sums as may hereinafter be determined.

138.    Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

139.    As a direct and proximate result of the willful, wrongful and intentional acts of the Defendant and of Hamas described herein, for which the Defendant is directly and vicariously

liable, each of the U.S. national Plaintiffs have endured extreme mental anguish, death and/or physical injury, pain and suffering, solatium, and loss of the affection, love and companionship of their loved one, loss of income and other pecuniary loss, for which the Plaintiffs and each of them seek an award of damages and judgment against the Defendant, to the fullest extent of the law.

## SECOND COUNT
## <u>WRONGFUL DEATH</u>
### (Under the Law of the District of Columbia and Other Applicable Law)

140.    The preceding allegations are incorporated by reference as though fully set forth herein.

141.    Iran, itself and/or through its officers, agents, employees and/or co-conspirators, willfully and deliberately caused, authorized, organized, planned, aided, abetted, induced, conspired to commit, provided material support for, and executed the Attack.

142.    Iran's behavior constituted a breach of legal duties to desist from causing, committing, aiding, abetting, authorizing, inducing, or conspiring to commit, acts of extrajudicial killing, and to refrain from intentionally, recklessly, or negligently causing the infliction of death, physical injuries or harm to persons such as the plaintiffs herein and their decedents.

143.    Iran's actions were willful, malicious, intentional, wrongful, unlawful, negligent and/or reckless and were the proximate cause of the Terrorist Attack and the death of decedent Pdaya Mark.

144.    At the time of his death, decedent Pdaya Mark was 22 years of age, enjoying good health, was industrious and in possession of all his faculties.

145.    The murder of Pdaya Mark caused decedent, his estate, and all plaintiffs herein severe injury, including, pain and suffering; pecuniary loss and loss of income; loss of guidance,

companionship, and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

146.    Iran is therefore liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

147.    Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

**THIRD COUNT**
**<u>SURVIVAL DAMAGES</u>**
**(Under the Law of the District of Columbia and Other Applicable Law)**
**(Estate of Pdaya Mark)**

148.    The preceding allegations are incorporated by reference as though fully set forth herein.

149.    The murder of Pdaya Mark caused him and his estate severe injury, including pain and suffering, pecuniary loss, and loss of income. From the beginning of the Attack until his death, Pdaya Mark suffered great conscious pain, shock and physical and mental anguish.

150.    Iran is therefore liable to the Estate of Pdaya Mark, for the full amount of decedent's damages, in such sums as may hereinafter be determined.

151.    Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

**FOURTH COUNT**
**<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/ SOLATIUM</u>**
**(Under the Law of the District of Columbia and Other Applicable Law)**

152.    The preceding allegations are incorporated by reference as though fully set forth herein.

23

153.    Iran's conduct was intentional, outrageous, and dangerous to human life, and violates applicable criminal law and all international standards of civilized human conduct and common decency.

154.    Iran is therefore liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

155.    Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

156.    Iran intended to, and did in fact, terrorize the decedent and the plaintiffs, and cause them severe emotional distress.

157.    The Terrorist Attack and the murder of decedent Pdaya Mark, caused the decedent severe emotional distress. From the beginning of the Terrorist Attack until his death, Pdaya Mark suffered extreme terror, mental anguish, and injury to his feelings.

158.    As a result of the Terrorist Attack and murder of Pdaya Mark, all plaintiffs have been deprived of the services, society, consortium, and solatium of their son and brother, and have suffered and will continue to suffer extreme terror, severe mental anguish, bereavement and grief, and injury to their feelings.

### FIFTH COUNT
### NEGLIGENCE
**(Under the law of the State of Israel)**

159.    The preceding allegations are incorporated by reference as though fully set forth herein.

160.    Section 35 of the Israeli CWO creates a tort of Negligence. CWO §35 provides that a person is liable for the tort of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from

committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances he is obligated not to act as he did.

161.    CWO § 36 provides that the obligation stated in CWO § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

162.    Under binding precedent of the Israeli Supreme Court, the tort of Negligence also includes intentional and/or reckless conduct.

163.    Iran committed acts which a reasonable and prudent person would not have committed under the same circumstances, and refrained from committing acts which a reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO.

164.    Iran acted "negligently" in connection with the plaintiffs and their decedent, toward whom, in the circumstances described herein, Iran had an obligation not to act as it did. Iran was obligated not to act as it did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, the plaintiffs and their decedent were likely to be injured by Iran's acts and omissions described herein.

165.    Iran's behavior therefore constitutes Negligence under the CWO, and as a result of Iran's negligent behavior Pdaya Mark was murdered and the plaintiffs were severely injured, as set forth herein.

166.    Iran is therefore liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

167.    Iran's conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

**SIXTH COUNT**
**CIVIL CONSPIRACY**
**(Under the Law of the District of Columbia,**
**the Law of the State of Israel, and Other Applicable Law)**

168.    The preceding allegations are incorporated by reference as though fully set forth herein.

169.    Iran knowingly and willingly conspired, agreed, and acted in concert with Hamas in a common plan and design to facilitate and cause acts of international terrorism, extrajudicial killing, torture, hostage taking, and personal injury including the Terrorist Attack.

170.    As a result of the Terrorist Attack caused, resulting from, and facilitated by Iran's conspiracy with Hamas and others, the plaintiffs suffered the damages enumerated herein.

171.    Civil conspiracy principles are recognized in Israeli law in § 12 of the CWO, which provides that a person who participates in, assists, advises, or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

172.    Iran is therefore liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

## SEVENTH COUNT
## AIDING AND ABETTING
### (Under the Law of the District of Columbia,
### the Law of the State of Israel, and Other Applicable Law)

173.    The preceding allegations are incorporated by reference as though fully set forth herein.

174.    Iran provided Hamas with material support and resources within the meaning of 28 U.S.C. §1605A, and other substantial aid and assistance, in order to aid, abet, facilitate, and cause the commission of acts of international terrorism, extrajudicial killing and personal injury including the Terrorist Attack.

175.    As a result of the Terrorist Attack caused, resulting from, and facilitated by Iran's provision of material support and resources to, and other acts of aiding and abetting Hamas, the plaintiffs suffered the damages enumerated herein.

176.    Aiding and abetting principles are recognized in Israeli law in § 12 of the CWO, which provides that a person who participates in, assists, advises, or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

177.    Iran is therefore liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

## EIGHTH COUNT
## VICARIOUS LIABILITY/RESPONDEAT SUPERIOR
### (Under the Law of the District of Columbia,
### the Law of the State of Israel, and Other Applicable Law)

178.    The preceding allegations are incorporated by reference as though fully set forth herein.

179.    At all relevant times, the Iranian Officials and Agents were officers, employees, and agents of Iran, acting within the scope of their office, employment, and agency. The Iranian Officials and Agents engaged in the actions described herein within the scope of their office, employment, and agency and in furtherance of the interests of defendant Iran.

180.    Iran authorized, ratified, and/or condoned the actions described herein of the Iranian Officials and Agents.

181.    Therefore, Iran is vicariously liable for the acts of the Iranian Officials and Agents.

182.    Respondeat superior and vicarious liability principles are recognized in Israeli law in CWO §§ 13 and 14, providing that an employer is liable for an act or omission committed by his employee, if the employer authorized or ratified the act or omission, or if the employee committed the act or omission in the course of his employment, and that a person who employs an agent for the performance of an act or a category of acts is liable for everything the agent does in the performance of that act or category of acts, and for the manner in which the agent performs them.

183.    Defendant Iran engaged Hamas as its agent to carry out terrorist attacks, including the Attack,  in order to achieve the goals shared by Iran and Hamas, such as terrorizing the Jewish civilian population in Israel, weakening Israel's economy, social fabric, and military strength and preparedness, and harming Israel's allies and supporters, especially the United States. The Attack was carried out by Hamas in fulfillment, and within the scope, of that agency relationship

184.    Iran is therefore liable for the full amount of plaintiffs' damages, in such sums as may hereinafter be determined.

28

### NINTH COUNT
### PUNITIVE DAMAGES
### Under 28 U.S.C. § 1605A(c) and Other Applicable Law
### (on behalf of all Plaintiffs)

185.    The preceding allegations are incorporated by reference as though fully set forth herein.

186.    The actions of Iran, who has been committing, sponsoring, and supporting acts of international terror against Americans and others at least since the early 1980s are heinous in nature, politically motivated, and target the United States of America, its citizens, residents and visitors, thereby rendering the Defendant liable for the heinous murders of Pdaya Mark, and the emotional and other injuries to each of the Plaintiffs, thereby entitling each of the Plaintiffs, to an award of damages as shall be determined at trial and in accordance with the laws of the United States and Israel.

187.    The acts of Iran carried out by its Officials and Agents as described above, were malicious, wilful, unlawful and in wanton disregard of life and the standards of law that govern the actions of civilized nations. The loss of life and the injuries as above described were intended as a result by the Defendant. The Plaintiffs are each victims of the acts of international terror committed by Hamas with the material support of Iran. In accordance with the provisions of 28 U.S.C §1605A(c), the Plaintiffs are thereby entitled to a maximal award of punitive damages to the fullest extent of the law.

188.    The actions of Hamas, as set forth hereinabove, were intentional and malicious and in willful, wanton, and reckless disregard of the rights and physical well-being of Pdaya Mark and each of the plaintiffs herein.

189.    The actions of Hamas and Iran were part of their ongoing and continuing campaign of terror committed against citizens of the United States and Israel in support of the

political goals and aims of Hamas and Iran to reject peace with Israel, to oppose US foreign policy in the region, and to use terror as a means of destroying the State of Israel, consistent with the foreign policy positions of Iran, which is an avowed enemy of Israel and the United States.

190.    The acts of Hamas were facilitated through material support for terrorism provided by Iran. This Court has previously found Iran liable for the support of Hamas and other Foreign Terrorist Organizations.

191.    Notwithstanding said findings, Iran has continued to sponsor and support terror. The Defendant must be punished by this Court for their acts of sponsorship of terror.

192.    Iran must be punished by this Court for its acts of sponsorship of terrorism.

**WHEREFORE**, plaintiffs demand judgment as follows:

a.   Judgment against defendant Iran for compensatory damages in an amount to be determined by the Court which is not less than eighty million dollars ($80,000,000);

b.   Judgment against defendant Iran for punitive damages in an amount to be determined by the Court;

c.   All of Plaintiffs' recoverable costs, including but not limited to expert expenses;

d.   Plaintiffs' attorneys' fees;

e.   Prejudgment and post-judgment interest;

f.   Such other and further relief as the Court finds just, proper, and/or equitable.

July 21, 2024                           Respectfully submitted,

                              /s/ Asher Perlin_____
                              Asher Perlin
                              LAW OFFICE OF ASHER PERLIN
                              Bar I.D. FL0006
                              4600 Sheridan Street, Suite 303
                              Hollywood, Florida 33021
                              786-687-0404
                              asher@asherpelin.com
                              *Attorney for Plaintiffs*
                              30